UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

GINA M. PEARCE, as Guardian of
distributees of Kristin Mary Palumbo Longo
(deceased) and Administratrix of the Estate
of Kristin Mary Palumbo Longo (deceased);
STEVEN L. PEARCE, as Guardian of
distributees of Kristin Mary Palumbo Longo
(deceased); and JOSEPH LONGO, as a
distributee of Kristin Mary Palumbo Longo
(deceased),

                Plaintiffs,

    -v-                         6:10-CV-1569

DANIEL LABELLA, Ind. and as a member
of the City of Utica Police Department, and
as Commissioner of Public Safety; the CITY
OF UTICA; and the CITY OF UTICA
POLICE DEPARTMENT,

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:                  OF COUNSEL:

OFFICE OF JOHN W. DILLON       JOHN W. DILLON, ESQ.
Attorney for Plaintiffs
44 Oxford Road
New Hartford, NY  13413

OFFICE OF CORPORATION COUNSEL   JOHN P. ORILIO, ESQ.
CITY OF UTICA                    ARMOND J. FESTINE, ESQ.
Attorneys for Defendants          MARK C. CURLEY, ESQ.
One Kennedy Plaza              ZACHARY C. OREN, ESQ.
Utica, NY  13502


DAVID N. HURD
United States District Judge

## MEMORANDUM–DECISION and ORDER

## I. INTRODUCTION

This case arises from the September 28, 2009, murder of Kristin Mary Palumbo Longo ("Kristin") by her estranged husband, Joseph A. Longo, Jr. ("Longo"), an officer with the Utica Police Department ("UPD"). Plaintiffs Gina and Steven Pearce—as guardians of Kristin's distributees[1]—and Joseph Longo, as a distributee of Kristin (collectively "plaintiffs"), bring this action alleging violations of Kristin's federal constitutional rights. The defendants include Daniel LaBella, former Chief of the UPD and Commissioner of Public Safety ("Chief LaBella"), and the City of Utica/UPD ("the City") (collectively "defendants").[2]

In their original complaint, plaintiffs asserted six federal causes of action pursuant to 42 U.S.C. § 1983 as well as a pendent state law negligence claim.[3] In a March 1, 2011, Memorandum–Decision and Order, defendants' motion to dismiss was granted in part and denied in part, and plaintiffs were granted leave to file an amended complaint. Pearce, 766 F. Supp. 2d at 380. The only remaining causes of action are the federal substantive due

---

[1] Gina Pearce is also the administratrix of Kristin's estate.

[2] In their original complaint, plaintiffs also named the Estate of Officer Joseph A. Longo, Jr. and David R. Roefaro, former Mayor of the City of Utica, as defendants. All federal claims against the Estate of Officer Longo were dismissed on March 1, 2011. Pearce v. Estate of Longo, 766 F. Supp. 2d 367 (N.D.N.Y. 2011). The United States Court of Appeals for the Second Circuit subsequently determined that Mayor Roefaro was entitled to qualified immunity, and therefore all claims against him were dismissed. Pearce v. LaBella, 473 F. App'x 16 (2d Cir. 2012) (summary order). All remaining claims against the Estate of Officer Longo were dismissed by stipulation on February 1, 2013. ECF No. 33. The Court of Appeals determined that Chief LaBella was not entitled to qualified immunity. Therefore, only two defendants remain in the case, Chief LaBella and the City/UPD.

[3] The federal causes of action are not clearly outlined in the original complaint or the subsequently filed amended complaint. At the motion to dismiss stage, the following six federal claims were identified: (1) a § 1983 conspiracy claim; (2) a loss of consortium claim; and claims alleging violations of (3) the Fourth Amendment; (4) the Eighth Amendment; (5) equal protection; and (6) substantive due process. The substantive due process claim is the only remaining federal claim. The pendent state claim(s) have not been clearly identified. The only state claim addressed in the parties' motion papers and at oral argument is the negligence claim. It is therefore assumed that this is the only state claim asserted by plaintiffs.

process claim and the pendent state negligence claim.  Both claims are asserted against both defendants.

The parties have completed extensive discovery, and defendants now seek summary judgment pursuant to Federal Rule of Civil Procedure 56.  They also seek to strike the report and testimony of plaintiffs' expert, Dr. Jon M. Shane ("Dr. Shane").  These motions have been fully briefed.  Oral argument was heard on August 27, 2013, in Utica, New York.  Decision was reserved.

## II.  FACTUAL BACKGROUND

Unless otherwise noted, the following facts are undisputed.  During the relevant time period Chief LaBella served as Chief of the UPD, and Mark Williams served as a deputy chief ("Deputy Chief Williams").[4]  Longo was employed as an investigator for the UPD.  As explained by Deputy Chief Williams during his deposition, Longo's chain of command in 2009 began with Sergeant Peter Scalise ("Sgt. Scalise"), who reported to Lieutenant Michael Zdanowicz ("Lt. Zdanowicz"), who reported to Captain James Watson ("Capt. Watson"), who reported to Deputy Chief Williams, who reported to Chief LaBella.  Chief LaBella and Longo were friends and had worked closely together on the UPD in the past.

Kristin and Longo were married in the early 1990s and had four children together.  Their marriage was fraught with discord, and Longo subjected Kristin and the children to verbal and, at times, physical abuse.  The marital problems intensified in May and June 2009 when Longo began an extramarital affair with Katheryn Zalewski, a UPD officer ("Kate").  Longo moved out of the marital home—which was located just outside the city of Utica in the

_____

[4]  Chief LaBella no longer works for the UPD, and Deputy Chief Williams is now the Chief.

adjoining Town of Deerfield, New York—and moved into his father's house, also in Deerfield. In July 2009 Kristin retained a local attorney, George Massoud ("Massoud"), for the purpose of initiating divorce proceedings against Longo.

According to Massoud and Kristin's sister, plaintiff Gina Pearce, Kristin contacted one of Longo's supervisors at the UPD on or about July 19, 2009, to report an incident of domestic violence wherein Longo became enraged and pushed Kristin and/or their eight-year-old son to the ground. Kristin reportedly told Massoud and her sister that the supervisor discouraged her from seeking an order of protection because such could impact his employment and, in turn, the family's finances. Kristin's father, Joseph Palumbo, recounted the same event and identified Deputy Chief Michael Bailey ("Deputy Chief Bailey") as the supervisor who discouraged her from seeking an order of protection.

On July 22 the UPD received an anonymous written complaint against Longo. The complaint, dated June 1, 2009, and signed by a "Concerned employee," alleged that Longo handled his loaded service weapon in an unsafe manner on three separate occasions while working as a part-time security guard at Proctor High School in the City.[5] At the direction of Deputy Chief Williams, Lieutenant David Mickle ("Lt. Mickle") of the UPD's Professional Standards Unit[6] initiated a month-long internal investigation into the school incidents on July 23. Numerous witnesses were interviewed, including Longo and Kate. Longo initially denied the allegations.

On July 28 Shannon Tibbitts, an employee at the high school, advised Lt. Mickle that

---

[5] The complaint specifically alleged that Longo took his gun out of his holster to show a student and stuck his gun in the ribs of two school employees on separate occasions.

[6] This unit is often referred to as "Internal Affairs" in other police agencies.

during the past school year Longo had approached her from behind and placed his gun against her ribs.  While Tibbitts initially claimed Longo was only joking, during a subsequent interview she told Lt. Mickle that when he jabbed her with his gun, "It fucking hurt my side, I cried."  Festine Aff., Ex. 10, 9, ECF No. 57-11 ("Internal Report").[7]  On July 30 Shibe Coulett, another school employee, told Lt. Mickle that in January or February of 2009 Longo jokingly removed his gun from his holster and pointed it at Coulett's chest after Coulett asked if Longo had a new gun.

On August 3 Longo approached Capt. Watson and Lt. Zdanowicz in the police station. Longo claimed that he had spoken with Chief LaBella about the ongoing internal school investigation.  According to Capt. Watson, Longo stated that "Danny"—referring to Chief LaBella—assured him that "he would be all set as far as this investigation was concerned." Id. at 22.  Likewise, Lt. Zdanowicz reported:  "Inv. Longo stated that he spoke with Danny (Chief LaBella) and he was told that this was taken care of, and was a done deal."  Id. at 28. Chief LaBella denies making such statements to Longo.  Lt. Mickle briefed Deputy Chief Williams and Chief LaBella on the status of the school investigation on August 11.  Chief LaBella issued a memorandum on August 13 suspending Longo from working as a security guard at the high school pending the result of the school investigation.

On August 14 Kristin twice called Longo's immediate supervisor, Sgt. Scalise, to report concerns regarding Longo's behavior in the wake of his suspension.  She advised that he had been crying and pacing in the front yard of the marital home the previous evening.  She also reported that in the past two weeks Longo had sent her text messages threatening to

---

[7]  The pagination corresponds to the page numbers as assigned on CM/ECF.  This convention will be used throughout the order for citations to exhibits.

harm her and himself. She voiced her fear for herself and the children, and claimed Longo was suicidal and had recently threatened to "go postal" on the family while brandishing his gun. Sgt. Scalise advised Kristin that he took her concerns seriously and promised to address them. He then communicated this information to Capt. Watson, who, in turn, contacted Deputy Chief Bailey and Chief LaBella.[8]

Deputy Chief Bailey and Chief LaBella each reportedly contacted Longo by phone on August 14 to discuss Kristin's concerns. According to Deputy Chief Bailey and Chief LaBella, Longo advised that he was on a boat in the Saint Lawrence River with Kate, denied any suicidal ideation at the time, and claimed that he had begun meeting with a counselor. On August 17 Deputy Chief Bailey met with Longo at the start of his shift to again discuss Kristin's recent contact with Sgt. Scalise. According to plaintiff Gina Pearce, Kristin advised that Longo appeared at the marital home after this meeting, brandished his gun in a threatening manner, and claimed that the UPD's investigation into his recent behavior was closed. Phone records indicate that Kristin attempted to contact Sgt. Scalise several times on the evening of August 17 and had at least one conversation with him that lasted thirteen minutes. Sgt. Scalise does not recall what was discussed during this conversation.

Also on August 17, Kristin's father, Joseph Palumbo, contacted Capt. Watson to voice his concerns regarding Longo's recent threatening behavior and to suggest Longo needed mental health counseling. Capt. Watson gave his cell phone number to Mr. Palumbo and encouraged him to have Kristin contact him directly if she so desired. Kristin called Capt. Watson the following morning to discuss Longo's recent behavior. She described the August

---

[8] However, unlike the school investigation, there was never an internal domestic violence investigation regarding Kristin's fears.

13 incident, during which Longo had been to the marital home and was crying in the front yard. Kristin told Capt. Watson that when she asked what he was doing, Longo replied: "trying to get the balls to end it" because he had "nothing to live for." Dillon Aff., Ex. C, ECF No. 58-3, 3 ("Watson/Scalise Notes").

On August 18 Lt. Mickle continued his school investigation by interviewing Steve Scholl, who worked as a part-time security guard with Longo at Proctor High School. Scholl described a June 2009 incident in which he and Longo were in the security office at the high school discussing how cell phone records and text messages can be recovered online. Scholl knew of Longo's relationship with Kate and asked: "What if your wife finds out?" Internal Report 11. In response, Longo removed his gun from the holster and, jokingly, put the gun to his mouth.

During a follow-up interview by Lt. Mickle the next day, August 19, Longo admitted to being dishonest during his first interview and attributed this to stress related to his marital problems and financial matters. He then admitted to the incident described above by Steve Scholl. He also admitted that the incident involving Shannon Tibbitts occurred as she described. Although he denied intentionally pointing his weapon at Coulett's chest, he acknowledged that he had mishandled the gun and inadvertently pointed it toward him. On that same day, Lt. Mickle briefed Deputy Chiefs Williams and Bailey about the school investigation.

On August 27 Lt. Mickle completed his school investigation and provided a report to Chief LaBella. The report concluded that Longo's conduct was inappropriate and in violation of numerous UPD policies. It was further noted that Longo and Kate were not truthful and cooperative with the investigation. As a result, Capt. Watson recommended specific

disciplinary actions against Longo, which were still being considered at the time of the murder–suicide a month later.

Also during August 2009, Lt. Zdanowicz learned that Longo often drove a UPD vehicle to the marital home while on duty. According to defendants, Longo was admonished for this conduct and prohibited from taking a UPD vehicle out of the City while on duty. Longo violated this directive and, according to defendants, was placed on desk duty and advised not to leave the police station while on duty. Defendants maintain that he remained on desk duty until the day of the murder–suicide.

Longo met with a counselor, Patty Scalise, LCSW ("Ms. Scalise"), for the first and only time on September 12, 2009.[9] On the evening of September 14, Kristin contacted Capt. Watson on his cell phone and reported that, while on duty that evening, Longo had been at the marital home and threatened to kill himself. Specifically, plaintiffs allege that Longo put the barrel of his service weapon in his mouth and threatened to shoot himself in front of Kristin and their eight-year-old son.[10] Capt. Watson was out of town that evening but claims that he immediately alerted Lt. Zdanowicz, Sgt. Scalise, and Deputy Chief Williams. Lt. Zdanowicz reportedly called Longo into his office to discuss these concerns. Longo denied the allegations, denied being suicidal, and requested the rest of the evening off. Lt. Zdanowicz granted this request, but required him to leave his service weapon in his locker at the police station. Later that night Lt. Zdanowicz drove to Longo's father's residence to secure his off-duty handgun as well.

---

[9] Patty Scalise is of no familial relation to Sgt. Scalise.

[10] In their version of this incident, defendants claim Longo told Kristin that he was "going to Broad Street and shoot himself." Defs.' Statement of Material Facts ¶ 27, ECF No. 57-17.

Within the next few days, Longo appeared at the office of Deputy Chief Williams.  He

began "yelling and screaming" about his guns being confiscated, and angrily accused Deputy

Chief Williams of being "out to get him."  Festine Aff., Ex. 5, 19, ECF No. 57-6 ("Williams

Dep.").  Longo apologized for the outburst the next day, at which time Deputy Chief Williams

recommended counseling.  Longo advised that he was already engaged in counseling with

Ms. Scalise and was scheduled to meet with her next on September 28.  Longo's personal

firearm was secured in Sgt. Scalise's locker in the police station at that time.

On September 24 an Order to Show Cause was filed on Kristin's behalf in Supreme

Court, Oneida County, directing Longo to appear in court on September 28 to begin divorce

proceedings.  Plaintiffs allege that Kristin contacted Longo's supervisors at the UPD on

September 18 and September 25 to alert them that Longo would soon be served with divorce

papers and to express her concern that this may prompt a violent reaction.  Defendants

maintain that Kristin contacted Capt. Watson only once, on September 25, to advise of the

pending divorce proceedings.  Defendants further claim that Kristin told Capt. Watson that

the relations between her and Longo had improved.  In any event, no action was taken by the

UPD.

Kristin and Longo both appeared in court on September 28, 2009.  Kristin was

awarded exclusive possession of the marital home and temporary physical custody of the

children.  After the court proceeding, Longo contacted Lt. Zdanowicz and requested the

evening off.  This request was granted.  Lt. Zdanowicz claims that Longo did not sound upset

or distraught during this conversation.  Longo then called Kate, expressed his frustration with

the court proceeding, and made dinner plans for that evening.  At approximately 3:15 p.m.,

however, he entered Kristin's home, stabbed her to death, and committed suicide by

stabbing himself.

Since the September 28, 2009, murder–suicide, several UPD officers have been required to undergo mental health evaluations to ensure they are fit for duty. Officer Cathleen Dwyer ("Dwyer") was required to complete such an evaluation in June 2010 after she told a colleague: "Oh, I think tomorrow or today's going to be a two Prozac day." Dillon Aff., Ex. H, 15:22–23, ECF No. 58-8 ("Dwyer Dep."). Dwyer claims that when she protested the need for an evaluation Deputy Chief Bailey stated: "We made a mistake with Longo. We're not going to have another Longo situation." Id. at 8:20–22. Deputy Chief Bailey acknowledged that he required Dwyer to complete the evaluation and reported that he personally drove her to Albany twice for appointments with a psychologist. However, he denies making the admission regarding the "Longo situation."[11]

## III. DISCUSSION

Defendants argue that: (1) the report and testimony of Dr. Shane should be stricken and precluded; (2) they are entitled to summary judgment on the merits of the substantive due process claim; (3) there is insufficient evidence to establish that any City policy, custom, or failure to train caused the alleged constitutional violation; (4) Chief LaBella was not personally involved in the conduct that allegedly caused the constitutional violation; (5) Chief LaBella is entitled to qualified immunity; (6) the City did not owe Kristin a "special duty" to support a negligence claim; and (7) the governmental function at issue was discretionary, not ministerial, and therefore cannot subject the municipality to liability for alleged negligence.

---

[11] For a concise list of relevant reported events, as viewed in the light most favorable to plaintiffs, see Exhibit A attached to this Memorandum–Decision and Order.

## A.  Motion for Summary Judgment—Legal Standard

Defendants have moved for summary judgment pursuant to Federal Rule of Civil Procedure 56.  The entry of summary judgment is warranted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (citing FED. R. CIV. P. 56(c)); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986).  A fact is "material" for purposes of this inquiry if it "might affect the outcome of the suit under the governing law."  Anderson, 477 U.S. at 248; see also Jeffreys v. City of New York, 426 F.3d 549, 553 (2d Cir. 2005).  A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson, 477 U.S. at 248.

When summary judgment is sought, the moving party bears the initial burden of demonstrating that there is no genuine issue of material fact to be decided with respect to any essential element of the claim.  Id. at 250 n.4.  The failure to meet this burden warrants denial of the motion.  Id.  In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial.  Id. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities and draw all inferences from the facts in a light most favorable to the nonmoving party.  Jeffreys, 426 F.3d at 553.  Summary judgment is inappropriate where "review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-movant's] favor."  Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002) (citation omitted); see also Anderson, 477 U.S. at 250 (summary judgment is appropriate only when "there can be but

one reasonable conclusion as to the verdict").

**B. Defendants' Motion to Strike Plaintiffs' Expert**

Defendants argue that the report and testimony of plaintiffs' expert, Dr. Shane, must be stricken because plaintiffs failed to timely supplement their initial expert disclosure.

Pursuant to Federal Rule of Civil Procedure 26(a)(2)(D), a party must disclose the identity of its expert within the time frame ordered by the court. Such disclosure may be supplemented "by the time the party's pretrial disclosures under Rule 26(a)(3) are due." FED. R. CIV. P. 26(e)(2). Unless otherwise ordered, pretrial disclosures are due thirty days prior to trial. FED. R. CIV. P. 26(a)(3)(B).

Pursuant to the Text Order entered by Hon. David E. Peebles, United States Magistrate Judge, on February 11, 2013, plaintiffs were required to disclose their expert and provide a copy of his report by March 15, 2013. Defendants acknowledge that plaintiffs timely served the expert disclosure report for Dr. Shane on March 15. On August 4, 2013, defendants received, as part of plaintiffs' opposition to the motion for summary judgment, a new expert report dated July 27, 2013. Defendants fail to explain how this supplemental expert report is untimely. Although the trial date in this case has not yet been established, the trial clearly was not going to begin by September 4—thirty days after defendants received the supplemental report.

The expert report is thus timely, and defendants' motion to strike will be denied.

**C. Substantive Due Process Claim**

Defendants argue that they are entitled to summary judgment on the substantive due process claim because they responded appropriately to Longo's behavior and were not deliberately indifferent to the risks Kristin faced. They point out that they conducted an

- 12 -

internal investigation into allegations involving Longo's part-time employment at Proctor High School, suspended him from working as a security guard, prohibited him from traveling to the marital home while on duty, placed him on desk duty, encouraged him to engage in counseling, and eventually confiscated his firearms.

Generally, a state's failure to protect an individual from private violence does not amount to a due process violation. See DeShaney v. Winnebago Cnty. Dep't of Soc. Servs., 489 U.S. 189, 197 (1989). An exception exists where "officers in some way had assisted in creating or increasing the danger to the victim." Okin v. Vill. of Cornwall-On-Hudson Police Dep't, 577 F.3d 415, 428 (2d Cir. 2009) (internal quotation marks omitted). To fit this exception, the state actors' conduct must be active, not merely passive. Indeed, "[a] failure to interfere when misconduct takes place, and no more, is not sufficient to amount to a state created danger." Pena v. DePrisco, 432 F.3d 98, 110 (2d Cir. 2005).

Under this exception, defendants can violate the Due Process Clause by implicitly encouraging an offender's actions. See Okin, 577 F.3d at 430 (police officers who failed to properly investigate repeated allegations of domestic violence or arrest the offender implied that his actions were permissible and thus affirmatively "increased the risk of violence to the victim"). Indeed, "repeated, sustained inaction by government officials, in the face of potential acts of violence, might constitute 'prior assurances' rising to the level of an affirmative condoning of private violence." Id. at 428 (internal citation omitted). In other words, when state actors "communicate to a private person that he or she will not be arrested, punished, or otherwise interfered with while engaging in misconduct that is likely to endanger the life, liberty or property of others, those officials can be held liable under section 1983 for injury caused by the misconduct." Pena, 432 F.3d at 111 (noting that "[t]his is so

even though none of the defendants are alleged to have communicated the approval explicitly").

Further, to prevail on their substantive due process claim, plaintiffs must show that "the state action was 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'" Okin, 577 F.3d at 431 (quoting Cnty. of Sacramento v. Lewis, 523 U.S. 833, 847 n.8 (1998)).

It is undisputed that Chief LaBella and the other UPD officials in Longo's chain of command were aware of his ongoing and escalating conduct. There is sufficient evidence in the record from which to infer that defendants knew of domestic violence incidents precipitated by Longo against Kristin as early as mid-July of 2009. There is at least some evidence that a UPD official discouraged Kristin from seeking an order of protection at that time. Thereafter, during the summer of 2009, defendants learned of Longo's troubling and erratic behavior from two independent and reliable sources: Kristin's and her father's numerous contacts with UPD officials and Lt. Mickle's internal school investigation.

Throughout July and August Kristin and her father repeatedly contacted various high-ranking members of the UPD to convey her fear. She specifically explained that Longo was upset about his suspension, sent threatening text messages, appeared suicidal, and threatened to "go postal" on the family. On August 18 she informed Capt. Watson that Longo had recently been crying in her front yard while claiming he had "nothing to live for" and trying to summon the courage to end his life. Kristin's father also contacted Capt. Watson to voice his concern for his daughter and express his belief that Longo needed counseling. Defendants knew that during this time period Longo repeatedly drove a UPD vehicle to the marital home while on duty, even after being forbidden to do so by his

supervisor.

Also in July and August, Lt. Mickle's school investigation revealed several troubling incidents. Two school employees reported that during the latter half of the prior school year Longo pointed his firearm at them, albeit jokingly. A third employee detailed an incident during which Longo put his gun in his own mouth, implying that he would shoot himself if Kristin discovered evidence of his relationship with Kate. Longo admitted to two of these incidents, tacitly acknowledged mishandling his weapon during the third incident, and conceded that he had initially lied about these events. He partially, and forebodingly, blamed marital stress for his dishonesty. Chief LaBella and Deputy Chiefs Williams and Bailey were kept abreast of the ongoing school investigation.

In response to the incidents reported and information gathered through August, defendants suspended Longo from working at Proctor High School and placed him on desk duty. Chief LaBella contacted him, by phone, once during this time period. He did not request a mental health exam, confiscate his guns, or speak to him in person. Even though Chief LaBella and Deputy Chief Bailey knew Longo tended to be manipulative and dishonest, they merely took him at his word when he denied having any intention of harming himself or his family. Various UPD employees testified that Longo was often untrustworthy, and Lt. Mickle's report noted that he had been dishonest and uncooperative during the same time period. Such a non investigation into serious and erratic behavior could support an inference of deliberate indifference.

Moreover, on August 3 Longo boasted to Capt. Watson and Lt. Zdanowicz that he had spoken with his friend, Chief LaBella, about the ongoing internal school investigation. According to Capt. Watson and Lt. Zdanowicz, Longo referred to Chief LaBella as "Danny"

and claimed the Chief had assured him the school investigation would be closed and implied that he would be cleared of any wrongdoing. A reasonable jury could infer that if Chief LaBella made such comments, they amounted to an affirmative condoning of Longo's threatening behavior. Indeed, there is testimony suggesting defendants' response emboldened Longo, who reportedly brandished his gun at the marital home on August 17 after meeting with his supervisors.

The situation became even more dangerous in early-September. Although Longo's guns were eventually confiscated, this was not done until September 14—after Kristin told Capt. Watson that Longo had been to the marital home earlier that day, put the barrel of his service weapon in his mouth, and threatened to kill himself in front of her and their young son. Further, when he confiscated Longo's guns, Lt. Zdanowicz took Longo at his word when he denied the allegations and denied being suicidal.

Defendants never initiated an internal investigation into Kristin's allegations of domestic violence despite a UPD policy mandating a full internal investigation by the Professional Standards Unit into "domestic incidents" involving UPD officers.[12] Dillon Aff., Ex. F, § 20.23(D), ECF No. 58-6 ("UPD Policy"). Deputy Chief Williams acknowledged that the failure to investigate Kristin's allegations or to contact the law enforcement agency within whose jurisdiction she resided violated this policy. See Williams Dep. 27–28.

Nor did anyone in the UPD ever demand that Longo complete a mental health evaluation pursuant to New York Mental Hygiene Law or an evaluation to ensure his fitness

---

[12] Although this policy has been updated since the summer of 2009, the UPD officials testified that the version contained in the record, including the mandated internal investigation and reporting requirements, generally reflects the policy that was in effect at the time of the relevant events. See, e.g., Festine Aff., Ex. 9, 15:3–15, ECF No. 57-10 ("Watson Dep.").

for duty. The only time Deputy Chief Williams even suggested counseling directly to Longo was in late-September, after Longo personally yelled and cursed at him in the police station. In fact, Longo only engaged in <u>one</u> counseling session during this entire time period. Deputy Chief Bailey allegedly admitted to officer Dwyer that the UPD "made a mistake with Longo" by not requiring him to undergo a mental health evaluation. Dwyer Dep. 8:20–22. Finally, defendants did not take any action after Kristin twice advised Longo's supervisors that he would be served with divorce papers and voiced her concern that this may spark a violent reaction.

In short, there is sufficient evidence in the record to present issues of material fact regarding whether defendants' conduct amounted to more than a passive failure to interfere. Viewing the evidence in the light most favorable to plaintiffs, a reasonable jury could conclude that defendants were deliberately indifferent to the escalating situation and that their lack of an adequate response to Longo's threatening behavior emboldened him and implicitly encouraged his actions, thereby affirmatively increasing the danger Kristin faced. Such conduct by defendants "over an extended period of time and in the face of action that presented obvious risk of severe consequences and extreme danger, falls within the realm of behavior that can properly be characterized as conscience shocking, in a constitutional sense." <u>Okin</u>, 577 F.3d at 431 (internal quotation marks and alteration omitted).

Accordingly, defendants' motion for summary judgment will be denied with respect to the substantive due process claim.

### D. <u>Monell Liability</u>

Defendants next argue that there is insufficient evidence to establish that any City policy, custom, or failure to train caused the constitutional violation.

In order to hold the City liable under § 1983, plaintiffs must prove that the constitutional violation was caused by: (1) a municipal policy; (2) a municipal custom or practice; or (3) the decision of a municipal policymaker. Monell v. Dep't of Soc. Servs. of N.Y.C., 436 U.S. 658, 694 (1978). A municipality can be found to have a policy or custom that causes a constitutional violation when it is "faced with a pattern of misconduct and does nothing, compelling the conclusion that [it] has acquiesced in or tacitly authorized its subordinates' unlawful actions." Reynolds v. Giuliani, 506 F.3d 183, 192 (2d Cir. 2007).

The failure to adequately train city employees can be a basis for municipal liability. A municipality's failure to train its employees satisfies the policy or custom requirement "where the need to act is so obvious, and the inadequacy of current practices so likely to result in a deprivation of federal rights, that the municipality or official can be found deliberately indifferent to the need." Id.; see also City of Canton, Ohio v. Harris, 489 U.S. 378, 392 (1989). To prove deliberate indifference, plaintiffs must show that: (1) "a policymaker knows to a moral certainty that [his] employees will confront a given situation"; (2) "the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation"; and (3) "the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights." Walker v. City of New York, 974 F.2d 293, 297–98 (2d Cir. 1992) (internal quotation marks omitted); see also Vann v. City of New York, 72 F.3d 1040, 1049 (2d Cir. 1995) ("[D]eliberate indifference may be inferred if the complaints are followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents.").

There is sufficient evidence in the record to create issues of material fact regarding

the City's Monell liability.  As detailed above, a reasonable jury could conclude that defendants were deliberately indifferent to the risks Kristin faced as a result of Longo's increasingly threatening behavior.  City policymakers, such as Chief LaBella, should expect police officers and supervisors to confront situations where other officers engage in violent behavior or domestic violence.  Sufficient policies and proper training would undoubtedly assist officers in handling such dangerous situations.

Indeed, proper supervision and adherence to UPD policy would have at the very least triggered a full investigation into each domestic incident Kristin reported.  Instead, no meaningful attempt to investigate those reports or to evaluate Longo's mental stability were made.  Further, Kristin reportedly told several people that a supervisor at the UPD actually discouraged her from making a formal complaint and seeking an order of protection.  Defendants' response to the events that occurred or were revealed during the summer of 2009 could be considered an acquiescence to Longo's continued and escalating behavior, which would likely cause serious harm to Kristin.

In addition, plaintiffs correctly point out that the UPD policies in place in 2009 did not require "fitness for duty" evaluations, did not outline adequate preventative measures for identified troubled employees, and did not contain specific guidelines regarding whether an officer should be involuntarily committed to a mental health facility pursuant to New York Mental Hygiene Law section 9.41.  During his deposition, Deputy Chief Williams tacitly acknowledged that the existing policies needed to be strengthened in these areas.  Williams Dep. 34:11–21 (noting that, as Chief, he intended to "eventually" adopt policies recommended by the International Association of Police Chiefs regarding officer involved domestic violence).

Accordingly, defendants' motion for summary judgment will be denied with respect to the City's <u>Monell</u> liability.

### E. <u>Personal Involvement/Qualified Immunity</u>

Defendants' assertion that Chief LaBella was not personally involved in the conduct that allegedly caused the due process violation is completely without merit.  As explained above, there is sufficient evidence to show that he was aware of Longo's behavior during the summer of 2009.  He acknowledged such in his deposition.  Further, Lt. Mickle briefed him on the ongoing internal school investigation at least once, and he had one phone conversation with Longo.  Moreover, Longo boasted to Lt. Zdanowicz and Capt. Watson that "Danny" told him the school investigation "was taken care of, and was a done deal."  Internal Report 28.  This is sufficient evidence to establish the personal involvement of a supervisor under the first <u>Colon</u> factor.  <u>See</u> <u>Colon v. Coughlin</u>, 58 F.3d 865, 873 (2d Cir. 1995) (noting that supervisory liability may be found where "the defendant participated directly in the alleged constitutional violation").

The constitutional right implicated in this matter was clearly established at the time of these events.  <u>See</u> <u>Okin</u>, 577 F.3d at 437.  In affirming this Court's denial of qualified immunity as to Chief LaBella, the United States Court of Appeals for the Second Circuit noted the facts alleged by plaintiffs, "if true, would permit a jury to conclude that LaBella 'communicate[d] to a private person'—Joseph Longo—'that he or she will not be arrested, punished, or otherwise interfered with while engaging in misconduct that is likely to endanger the life, liberty or property of others.'" <u>Pearce</u>, 473 F. App'x at 19 (quoting <u>Pena</u>, 432 F.3d at 111).  The Second Circuit specifically held that because "this conclusion is based on caselaw that was well established at the time of LaBella's actions in 2009, qualified immunity would

not apply if the allegations are successfully proven." Id.

Discovery has only enhanced the allegations in the amended complaint.  In response to the numerous troubling incidents and reports involving Longo, Chief LaBella contacted him only once, by phone.  During his deposition, Chief LaBella claimed that Longo "had a tendency to embellish and lie, especially on personal issues."  Festine Aff., Ex. 8, 30:4–5, ECF No. 57-9.  He further noted that Longo "always found a way to, for lack of a better term, manipulate when he told a story when it wasn't his favor."  Id. 33:8–10.  Nonetheless, he simply took Longo at his word when he denied being suicidal or a danger to his family.  He did not mandate a mental health exam, confiscate his guns, or speak to him in person.  Nor did he direct an internal investigation into Kristin's allegations of domestic violence, as required by UPD policy.

Moreover, Longo boasted to Capt. Watson and Lt. Zdanowicz that he had spoken with his friend, "Danny," who had assured him the internal school investigation would be closed. Although Chief LaBella denies making this statement to Longo, a reasonable jury could infer that if he did make such comments, they amounted to an affirmative condoning of Longo's threatening behavior.

In short, there is now more than sufficient evidence in the record for a jury to conclude that Chief LaBella's conduct violated Kristin's clearly established constitutional right.  As the Second Circuit has already held, Chief LaBella is not entitled to qualified immunity.

## F.  Negligence Claim

Finally, defendants argue that the negligence claim must be dismissed because they did not owe a "special duty" to Kristin, who resided outside the UPD's jurisdiction.  They further assert that the conduct at issue involved solely discretionary governmental functions,

which cannot serve as the basis for a negligence claim under New York law.

Where, as here, municipal defendants assert both the special duty and governmental function defenses, "the rule that emerges is that government action, if discretionary, may not be a basis for liability, while ministerial actions may be, but only if they violate a special duty owed to the plaintiff, apart from any duty to the public in general." Valdez v. City of New York, 18 N.Y.3d 69, 76–77 (2011) (internal quotation marks and alteration omitted). Courts considering such a claim must first determine whether the municipal defendants owed a special duty to the claimant. Metz v. State of New York, 20 N.Y.3d 175, 179 (2012).

### 1. **Special Duty**

A special duty, often referred to as a special relationship, can arise when a municipality: (1) "violates a statutory duty enacted for the benefit of a particular class of persons"; (2) "voluntarily assumes a duty that generates justifiable reliance by the person who benefits from the duty"; or (3) "assumes positive direction and control in the face of a known, blatant and dangerous safety violation." Pelaez v. Seide, 2 N.Y.3d 186, 199–200 (2004). Plaintiffs have the burden of establishing such a special duty. Id. at 199.

Plaintiffs maintain that a special duty was owed to Kristin under the second and third factors, based on representations made to her by Longo's supervisors. In order for a municipality to assume a special duty under the second factor, the following must be present:

> (1) an assumption by a municipality, through promises or actions, of an affirmative duty to act on behalf of the injured party; (2) knowledge on the part of a municipality's agents that inaction could lead to harm; (3) some form of direct contact between the municipality's agents and the injured party; and (4) that party's justifiable reliance on the municipality's affirmative undertaking.

Id. at 202.

It is undisputed that high-ranking members of the UPD knew about the concerns

Kristin voiced and the troubling incidents involving Longo's part-time employment. UPD officials within Longo's chain of command had direct contact with Kristin on numerous occasions. She repeatedly and unambiguously asserted that Longo was suicidal and expressed her fear that he may harm her and the children as well. She was assured by Sgt. Scalise that the UPD took her concerns seriously and would address the situation. Capt. Watson provided her with his personal cell phone number and encouraged her to call at any time to discuss her concerns. Moreover, the UPD policy regarding officer-involved domestic incidents is aimed at addressing a specific situation; to wit, properly responding to alleged incidents of domestic violence involving UPD officers. As the wife of a UPD officer, Kristin was clearly part of the class of persons this policy was designed to benefit—victims of domestic violence perpetrated by UPD officers.[13]

Defendants maintain that any reliance by Kristin on their representations was not justified because she resided outside of the City. This fact is irrelevant. As the wife of a UPD officer, the location of Kristin's home does not in any way diminish the reasonableness of her reliance on defendants' representations and promises to address the matter with her husband, their subordinate.

Nor would it be clear to a private citizen which agency has jurisdiction over a particular geographic area. During his deposition, plaintiff Steven Pearce expressed his understanding

---

[13] The fact that Longo was an officer of the UPD—and not simply a private citizen—distinguishes this matter from the cases cited by defendants. Those cases involve harm caused by private third parties and not directly by a police officer. See Valdez, 18 N.Y.3d at 72 (plaintiff shot by her estranged boyfriend, a private citizen); Bawa v. City of New York, 94 A.D.3d 926, 926 (N.Y. App. Div. 2d Dep't) (decedent shot and killed by her son, a private citizen), leave denied, 19 N.Y.3d 809 (2012); Hamill v. Town of Dewitt, 162 A.D.2d 1012, 1012 (N.Y. App. Div. 4th Dep't 1990) (plaintiff stabbed to death by friend's estranged husband, a private citizen); Bain v. City of Rochester, 115 A.D.2d 957, 957 (N.Y. App. Div. 4th Dep't 1985) (plaintiff killed by assailant unknown to the police); Yearwood v. Town of Brighton, 101 A.D.2d 498 499 (N.Y. App. Div. 4th Dep't 1984) (plaintiff's children killed in a fire set by her estranged husband, a private citizen).

that the UPD shares jurisdiction over the adjoining Town of Deerfield with the New York State Police and the Oneida County Sheriff's Office.  He specifically claimed that he has observed marked UPD vehicles in Deerfield, leading him to believe that UPD officers have law enforcement authority in that area.  Indeed, it is undisputed that Longo often drove a UPD vehicle to the marital home while on duty.

Moreover, the UPD policy specifically contemplates situations where the involved UPD officer resides outside of the City.  See UPD Policy § 20.23(D)(7) ("The Professional Standards Unit will be the central repository for all officer involved domestic incidents.  This includes incidents that occur outside of this agency's jurisdiction.").  Finally, many of the incidents at issue in this case occurred, or were discovered, within the City limits.  The entire internal school investigation, the troubling incidents revealed therein, and all of the supervisors' contact with Longo happened in the City of Utica.  The defendants never referred the Longo matter to any law enforcement agency who they claim did have proper jurisdiction.

A reasonable juror could conclude from the evidence that Kristin justifiably relied on defendants' representations that they would address the matter with Longo and that they possessed the authority to do so.  Therefore, plaintiffs have met their burden to establish the existence of a special duty.

2.  **Discretionary vs. Ministerial Function**

In order to successfully invoke the governmental function defense, the City "must do much more than merely allege that its employee was engaged in activities involving the exercise of discretion."  Valdez, 18 N.Y.3d at 79.  Whether the conduct of the municipal employees is discretionary, and thus subject to immunity from a negligence claim, depends

on whether their particular function inherently entails the use of discretion and judgment.  Id.
In addition, "the availability of governmental function immunity also turns on whether the
conduct giving rise to the claim is related to an exercise of that discretion."  Id.  In other
words, the municipal defendant must establish that "the action taken actually resulted from
discretionary decision-making."  Id. at 79–80; see also Haddock v. City of New York, 75
N.Y.2d 478, 485 (1990) (governmental function immunity is unavailable where municipality
fails to show that the asserted negligence was the consequence of an actual decision or
choice, as opposed to its failure to adhere to personnel procedures).

Defendants fail to establish that the governmental action taken resulted from strictly
discretionary decision-making.  A reasonable jury could find that following the UPD's clear
policy mandating an internal investigation into all reports of domestic incidents involving UPD
officers is a ministerial function.  Indeed, there is nothing in the language of the policy that
allows for the exercise of discretion when determining whether an investigation shall be
launched.  The policy instead uses terms such as "shall" and "will" when detailing the
appropriate response to reports of domestic incidents.  The failure to adhere to these steps
was not borne out of a conscious discretionary choice by defendants, nor was it the product
of a mere error of judgment on their part.  No choice or judgment was to be made.  Instead,
defendants were required to initiate a full internal domestic violence investigation, which—
according to the policy—should have been routine procedure.  The defendants failed to do
so.

Viewing the facts in the light most favorable to plaintiff establishes that defendants
owed a special duty to Kristin as the wife of a UPD officer, and that they breached that duty
by failing to implement their own clear domestic violence policy.  Accordingly, defendants'

motion for summary judgment will be denied with respect to the negligence claim.

## IV. <u>CONCLUSION</u>

There is sufficient evidence in the record to establish issues of material fact for a jury regarding whether defendants' response to Longo's escalating behavior increased the danger to Kristin and whether a municipal policy, custom, and/or failure to train caused her death.  There is also adequate evidence to establish the personal involvement of Chief LaBella, who is not entitled to qualified immunity.  Finally, viewing the evidence in the light most favorable to plaintiffs, a reasonable juror could conclude that defendants' owed Kristin a special duty and that their failure to carry out ministerial government functions, not discretionary decision-making, contributed to her death.

Therefore, it is

ORDERED that

1.  Defendants' motion to strike the expert report of Dr. Shane and preclude his testimony at trial is DENIED;

2.  Defendants' motion for summary judgment is DENIED;

3.  The § 1983 substantive due process claim and the pendent state negligence claim against the defendants Daniel LaBella and City of Utica/Utica Police Department will proceed to trial; and

4.  The trial will commence with jury selection at 9:30 a.m. on January 13, 2014, in Utica, New York.  Pretrial submissions shall be filed on or before December 27, 2013, at noon.

IT IS SO ORDERED.

United States District Judge

Dated:  September 20, 2013
        Utica, New York.

**Exhibit  A**

## CHRONOLOGICAL CHART OF REPORTED EVENTS

| | <u>DATE</u> (2009) | <u>EVENT</u> |
|---|---|---|
| 1. | July 19 | Kristin reports domestic incident to Deputy Chief Bailey |
| 2. | July 22 | UPD receives anonymous written complaint alleging misconduct by Longo at Proctor High School |
| 3. | July 23 | At direction of Deputy Chief Williams, Lt. Mickle opens internal investigation into school incidents |
| 4. | July 28 | Lt. Mickle interviews Shannon Tibbitts about school incident |
| 5. | July 30 | Lt. Mickle interviews Shibe Coulett about school incident |
| 6. | August 3 | Longo boasts to Capt. Watson and Lt. Zdanowicz in police station |
| 7. | August 11 | Lt. Mickle briefs Chief LaBella and Deputy Chief Williams on status of internal school investigation |
| 8. | August 13 | Chief LaBella suspends Longo from part-time employment |
| 9. | August 14 | Kristin contacts Sgt. Scalise twice to report domestic incident |
| 10. | August 17 | Deputy Chief Bailey meets with Longo in police station; Longo later appears at Kristin's home brandishing gun; Kristin contacts Sgt. Scalise; Joseph Palumbo contacts Capt. Watson |
| 11. | August 18 | Kristin contacts Capt. Watson to discuss domestic incidents; Lt. Mickle interviews Steve Scholl about school incident |
| 12. | August 19 | Lt. Mickle conducts follow-up interview with Longo about school incidents; Lt. Mickle briefs Deputy Chiefs Williams and Bailey on status of internal school investigation |
| 13. | August 27 | Lt. Mickle completes school investigation, provides report to Chief LaBella |
| 14. | September 12 | Longo meets with counselor for first, and only, time |
| 15. | September 14 | Kristin reports domestic incident to Capt. Watson; Lt. Zdanowicz confiscates Longo's guns |

| | | |
|---|---|---|
| 16. | September 15/16 | Longo appears at Deputy Chief Williams's office, screaming and claiming Williams is "out to get him"; Deputy Chief Williams suggests counseling the next day |
| 17. | September 18 | Kristin advises Longo's supervisors that divorce papers will be served soon |
| 18. | September 24 | Order to Show Cause filed in Supreme Court, Oneida County |
| 19. | September 25 | Kristin advises Longo's supervisors that divorce papers will be served soon |
| 20. | September 28 | Kristin and Longo appear in court; Longo later goes to Kristin's home, murders Kristin and commits suicide |